STEVEN G. KALAR
Federal Public Defender
JOHN PAUL REICHMUTH
Assistant Federal Public Defender
1301 Clay St. – Suite 1350N
Oakland, CA 94612
Telephone: (510) 637-3500

Counsel for Defendant MOORE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARVIN MOORE,<br><br>Defendant. | No. 14-563-JSW<br><br>DEFENDANT MARVIN MOORE'S<br>VIOLATION MEMORANDUM |

Mr. Moore intends to admit to the violations of supervised release alleged against him, except as to the allegation that he knowingly possessed child pornography. The Violation Memorandum submitted by the Probation Office correctly calculates a Guidelines range of 4-10 months prison, based on a Grade C violation and a Criminal History Category of I. The Probation Office requests a sentence of 18 months prison. Surely driving the Probation Office's recommendation is the allegation that "[a] forensic review of one of the hard drives contained 814 images of child pornography." *Supervised Release Violation Memorandum*, United States Probation Office, at 2 (hereinafter PO Memo). What this statement fails to mention is that these are deleted files -- not viewable by Mr. Moore – and their creation, modification, and accessed dates do not establish that Mr. Moore actually viewed them, or if he merely deleted them from a cache of other pornography. The evidence is consistent with Mr. Moore having viewed adult

1  pornography and cartoon pornography (anime), while seeking to not possess, view, or maintain
2  any actual child pornography files.  It is notable for example, that these alleged child
3  pornography files in the computer "trash" show no activity in the year preceding Mr. Moore's
4  arrest.  Mr. Moore's conduct is a relapse into pornography addiction, but it is not a re-offense.
5  The additional prison time that the government and Probation Office requests does not appear to
6  be justified by either protection of the public or rehabilitation of Mr. Moore.  A prison sentence
7  is justified by specific deterrence and to impress upon Mr. Moore the seriousness of his conduct,
8  and for that reason, Mr. Moore respectfully requests a mid-range sentence of 7 months prison.

### A. The Nature of the Violation

Mr. Moore had a number of computer devices that he had not disclosed to the Probation Officer.  One device, an external hard drive, was examined and found to have contained, at some time in the past, alleged child pornography.  The device has been examined by defense computer forensics examiner Tami Loehrs, by the Probation Office, and by the Federal Bureau of Investigations.  Ms. Loehrs' *Report of Forensic Examination* is attached as Exhibit 6 to *Declaration of AUSA Thomas R. Green*, filed separately by the government.  (Hereinafter Loehrs Report).  Ms. Loehrs examined the hard drive and concluded, among other things, that, "Western Digital hard drive serial number WD-WCANK4454958, was essentially blank at the time it was seized. That is, all of the user-created data resides in the unallocated space . . . . Unallocated space is the area of the hard drive that contains deleted data and is inaccessible to a computer user without the use of specialized forensic tools." (Loehrs Report 3).   She further explains:

> Files in unallocated space typically do not maintain any associated metadata such as the file name, file path or dates and times the files were created, modified or last accessed. As such, there is no evidence to determine the origin of the files, where they were located on the computer, when they were created, how long they existed before being deleted, whether they were ever opened or viewed, whether or not a user even knew of their existence or who was at the keyboard during any activity surrounding the files. The only thing that can be said about files recovered from unallocated space is that they existed on the hard drive at one time.

2

*Id.* at 10.

Ms. Loehrs opines that, following a lull of approximately six years of no use, activity began again on the hard drive. At this time,

> [b]etween January 28, 2014 and March 16, 2014, approximately 6,000 files and folders were created on the drive on six different dates. Most of the data consists of images.
> ...
> I am unable to say where any of the data on the drive originated (ie: downloaded from the Internet or copied from another device), if any of the data was ever opened and/or viewed.

Loehrs Report 3. Loehrs adds: "A "file created" date can have different meanings depending on the type of data and how that data was obtained. But for the purpose of this exam, "file created" would indicate when the file likely first existed on the drive." *Id.*

Loehr further opined:

> The "last accessed" date on the drive is March 16, 2014. "Last accessed" simply means that data was touched by something including, but not limited to, scanned with virus software, highlighted, clicked-on or opened. Based on the last accessed date, and the fact that all of the data on the drive was deleted, I can say that all data had been deleted by March 16, 2014 since the drive was never used after that date. In addition, some of the files created in 2006 and 2007 have "last accessed" dates in 2014 indicating they were still active as of that date. However, the "last accessed" date does not always indicate when a file was actually deleted.

*Id.* at 4.

It is anticipated that the government will argue that a number of alleged child pornography files were created or accessed during 2014. But as Ms. Loehrs' report establishes, the terms "created" and "accessed" can be misinterpreted. Thousands of files were moved onto the hard drive during a short period of time. That action "created" the images. Thousands of those images were not alleged child pornography. These files were transferred in bulk. Clearly, large data dumps, backups, or downloads of information took place, out of which a small minority of images are alleged child pornography. This is consistent with Mr. Moore backing up or consolidating storage devices which might still have contained some illicit images predating his conviction or illicit images mixed in with licit content. That they have been accessed recently does not mean that they were viewed, or even that their titles were viewed.

1    And what follows this consolidation and backing up of images is what appears to be the
2    deliberate destruction of all alleged child pornography. One then would naturally ask: if Mr.
3    Moore were trying to save files, then why is the hard drive empty? The answer may well be that
4    the anime and naturism images were retained on flash drives. (PO Memo 2). These are obvious
5    substitutes for child pornography.  Mr. Moore failed his polygraphs, but query whether it was
6    the viewing of these substitutes which caused Mr. Moore to feel he was being deceptive when
7    he stated he had not viewed child pornography. In sum, the evidence is consistent with an
8    attempt to gather and retain only licit pornography from old storage devices and other sources
9    and maintain a cache of it, a violation of Supervised Release, a pornography addiction relapse,
10   but a conscious effort not to possess child pornography again. If there is one thing every agent
11   swears about child pornography collectors, it is that they retain their collections. Why, if Mr.
12   Moore has a secret cache of storage devices, does he retain no child pornography? The answer
13   may be that he actually did learn a lesson. Prison did not cure him of his addiction, but both
14   prison and therapy appear to have significantly altered his relationship to child pornography.

**B.    The History and Characteristics of Mr. Moore**

Were Mr. Moore a dangerous person, his pornography addiction would be of greater concern. But Mr. Moore is not a danger. He is addicted to pornography, including anything "unusual or shocking." Mr. Moore:

> participated in a psycho-sexual deviance evaluation conducted by Vincent Gollogly, Ph.D., on October 17, 2010. Dr. Gollogly is a member of the Association for the Treatment of Sexual Abusers (ATSA) and has met the standards of the probation office for assessment and evaluation. The evaluation consisted of psychological testing with various tests to include the Minnesota Multiphasic Personality Inventory-II; a psycho-physiological assessment which included a sexual history polygraph; a risk assessment which included the Sexual Violence Risk-20 and HCR-20-Version 2; and collateral information to include Department of Homeland Security reports and the Complaint for Violation."

PSR ¶ 60.

The conclusions of this evaluation set Mr. Moore apart from many possessors of child pornography. Mr. Moore did not become involved with pornography through pedophilia:

> The defendant stated he once again began looking at pornography in 2000, when he was 37 years old. He said he began with looking at adult pornography and then went on to look at all sorts of different sites, including child pornography. He said it was a gradual process and he did not start looking at child pornography until about 2003. He said his pornography collection covered S&M, bondage, public nudity, naturism, transvestites, nude wrestling and boxing, and nude gymnastics. He also claimed the child pornography probably comprised of about 4% of his total collection. The defendant said he never had any desire to make contact with children. He said he is interested in adult females.

PSR ¶ 61. This description is consistent with Mr. Moore's having destroyed all of the alleged child pornography on the hard drive in this case. The Presentence Report also describes Mr. Moore's lack of sexually acting out,:

> He does have an addiction to child pornography, but he appears to have had a generally adequate sexual adaption. His self-report of being addicted to pornography is validated by his sexual history. He has engaged in viewing a considerable amount of pornography but he has not engaged in voyeurism, exposing, telephone scatologia, or attempted to contact individuals for the purpose of engaging in sex. He doesn't appear to have sexually acted out other than visiting prostitutes on 15 occasions in his second marriage. His pattern of acting out doesn't appear to be predatory, which is an important consideration for treatment in the community because this pattern of offending can be more easily managed and contained. . . . The structured clinical judgment approach to assessing sexual dangerousness suggests that he is a low risk for reoffense in both sexual and general dangerousness.

PSR ¶ 65.

> Finally, the Presentence Report concludes that Mr. Moore is treatable and not prone to engage in further criminal conduct:

> Following the evaluation process, to include polygraph testing wherein no deception was indicated, Dr. Gollogly made the following findings: the defendant was determined to have an Axis I diagnoses of Paraphilia NOS-Child Pornography and Adult Anti-Social Behavior. His sexual history polygraph report confirms that although he is diagnosed as having a Paraphilia NOS, he does not have a pattern of hands-on paraphilic behavior. There is no evidence that he has engaged any child sexually. He did not distribute or share images he collected. Results of psychological testing indicate the defendant does not manifest psychopathology that would render treatment more difficult. He is absent any disturbances of mood or severe substance abuse. This finding creates a more favorable prognosis. His testing indicates that he is devoid of anti-social dispositions suggesting that he is not likely to be a recidivist offender or prone to engage in criminal conduct.

PSR ¶ 64. That assessment was true at the time and it is still true. Is Mr. Moore's violation inconsistent with this conclusion? No, it is not. Despite the addiction, there appears to be an attempt in this case to avoid material that falls within the legal definition of child pornography.

5

Mr. Moore is a Berkeley educated civil engineer, the valedictorian of his class at Crenshaw High School. PSR ¶¶ 69-70. At the time of his arrest, he was a sanitary engineer at AE3 Partners. The partners in that firm, aware of Mr. Moore's past history, state:

> With the opportunity we have given him Mr. Moore has proven himself to be an exceptional and valuable employee. He has unique skill sets in the automation of waste water plants, the design of sanitary sewer systems and other areas which have created a unique niche with our clients. He has been absolutely trouble free and has gotten along well with our clients and staff and he would be difficult to replace with another person.

*Letter from Rick L. Dumas and Douglas A. Davis to the Court*, Aug. 26, 2015, attached as Exhibit A.

Mr. Moore's sister June Moore has also written to the court. She supports Mr. Moore and states, "Marvin suffered from shame after his release in 2012 and as a result he did not reach out to his family as he should have. We are here for him and will help him get through the stages that follow release from prison." *Letter from June Moore to the Court*, November 9, 2015, attached as Exhibit B. Mr. Moore can be a valuable member of his family and his community.

### C. The Mid-Range Sentence is the Appropriate Response to a Unique Case

Mr. Moore is not a danger to the community. He had excellent employment. And it appeared that he was actually seeking to retain lawful, if not permitted, types of pornography. For a person like him, with limited criminal history, the midrange sentence is a significant punishment. It means perhaps losing an excellent job, serving 7 months in a local jail, and cutting off his ability to financially support his college aged children. This is a strong message that deception and pornography will be met with jail. The leniency shown in the previous case is no reason to be excessive in this case. That leniency was based on reason. Mr. Moore was and is not the same as all other child pornography possessors. While it is true that he believed he could relapse without getting caught, he has learned that that was not a good assumption. The way to treat the addiction is to reconnect Mr. Moore with his family, his therapy, including polygraph examinations, and his work. The extra months in prison differentiating the

government's position from that of the defense are not likely to protect the public to any greater degree or to treat Mr. Moore's pornography addiction to any greater degree than the defense proposal.    With a pedophile or a predator, the superstructure of supervision that goes along with these cases might not be sufficient.  Here, that supervision succeeded in catching Mr. Moore's violations, and there is no reason to believe that further treatment will fail.

**D.    Conclusion**

The defense respectfully requests that the court sentence Mr. Moore to 7 months prison, followed by fifteen years of Supervised Release.

Dated: January 12, 2015

                                            Respectfully submitted,

                                            STEVEN G. KALAR
                                            Federal Public Defender

                                                /s/

                                            JOHN PAUL REICHMUTH
                                            Assistant Federal Public Defender